IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE NO. |
| v. | 1:16-CR-145-TWT-JKL-7 |
| VERTUIES WALL (7) | |

**ORDER AND NON-FINAL REPORT AND RECOMMENDATION**

This Order and Non-Final Report and Recommendation addresses the following pending motions filed by Defendant Vertuies Wall:

– Motion for Bill of Particulars [Doc. 675];

– Amended Motion to Suppress Evidence [Doc. 704-2].[1]

For the following reasons it is **ORDERED** that Wall's motion for a bill of particulars be **DENIED AS MOOT**. It is further **RECOMMENDED** that the motion to suppress evidence be **GRANTED**.

---

[1] Wall filed the Amended Motion to Suppress Evidence [Doc. 704-2] in a previous criminal action, *United States v. Wall*, Case No. 1:15-cr-00259-TWT-JKL ("*Wall I*"). The government dismissed that case without prejudice before post-hearing briefing was complete and before the Court ruled on the motion. Wall has adopted that motion and renews it in this case. [Doc. 704.] References to the docket in that case are noted as "*Wall I* Doc. ___."

## I.  BACKGROUND

Wall is charged in this case with RICO conspiracy (Count One).  [*See* Doc. 1.]  In connection with Count One, the indictment alleges that Wall was a member of the Gangster Disciples, which the government alleges operated as a racketeering enterprise as defined by 18 U.S.C. § 1961(4).  [*Id.* at 6.]  According to the indictment, the Gangster Disciples is "a highly structured organization."  [*Id.* at 2.]  Individual members are organized into geographic groups known as "counts."  [*Id.*]  The leader of a count is known as the "First Coordinator" or "First C."  [*Id.* at 5.]  Each count also has a Chief Enforcer who enforces gang rules within the count, and Chief Enforcers command "enforcement teams" to administer discipline.  [*Id.* at 4.]  During the time period relevant to this case, Wall allegedly served as a leader of the BLACC Team—a specially-named enforcement team for the Macon count—and as the First Coordinator for the Macon count.  [*Id.* at 5, 12.]

The indictment identifies several overt acts in which Wall allegedly engaged in furtherance of the RICO conspiracy.  Specifically, it alleges that on or about October 26, 2012, Wall and other Gangster Disciples members shot and injured W.R.  [Doc. 1 at 19.]  The government also alleges that on or about December 12, 2014, Wall, co-defendant Dereck Taylor (who allegedly provided

security for Wall), and other Gangster Disciples members met outside the Wings Café in Macon, Georgia, a nightclub known to be frequented by rival Crips gang members. [*Id.* at 31.] Before entering the nightclub, Taylor allegedly retrieved a firearm from Wall. Wall, Taylor, and other Gangster Disciples members then allegedly entered the nightclub and provoked an altercation with Crips gang members. Allegedly, Crips gang members retaliated, and Gangster Disciples member M.P. shot and killed a Crips gang member. More gunfire was exchanged, killing two other persons and injuring three more. [*Id.*] On the following day, December 13, 2014, Wall allegedly told Gangster Disciples member D.T. to arrange for a false police report to be made stating that the handgun used in the shooting had been stolen before the shooting at Wings Cafe, despite the fact that Wall possessed that firearm during the shooting. [*Id.* at 32.]

In April 2016, a grand jury returned the indictment in this case. On February 15, 2017, Wall filed a motion for bill of particulars. [Doc. 675.] The government has responded to the motion. [Doc. 846.]

Wall has also adopted a motion to suppress evidence that he filed in *Wall I*. [Doc. 704.] In that motion, he moves to suppress evidence that law enforcement purportedly seized from a black suitcase in his possession at the time of his arrest

in December 2014.  [Doc. 704-2.]  The government has responded to that motion.  [Doc. 1022.]

Wall also adopted a motion to suppress statements that he filed in *Wall I*.  [Docs. 704, 704-1.]  He has now filed a notice of withdrawal of that motion, and the Court considers the motion to suppress statements withdrawn.  [Doc. 1177.]

## II.  MOTION FOR BILL OF PARTICULARS [675]

Wall's Motion for Bill of Particulars is based on language in the forfeiture provision of the indictment.  The forfeiture provision pertinently states that:

> Upon conviction of one or more of the offenses alleged in Counts Three, Five, Seven, Nine, and Eleven of this Indictment, the defendants, LEWIS MOBELY, ALONZO WALTON, LADERRIS DICKERSON, **VERTUIES WALL**, and DONALD GLASS, shall forfeit to the United States pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), any firearm and ammunition used in the commission of said violation[.]

[Doc. 1 at 52 (emphasis added).]  Wall is not, however, charged in Counts Three, Five, Seven, Nine and Eleven of the indictment.  Wall therefore seeks a bill of particulars explaining why he was included in a forfeiture provision related to counts on which he was not charged.  [Doc. 675 at 2-3.]  The government responds that Wall was mistakenly included in the forfeiture provision relating to

4

Counts 3, 5, 7, 9, and 11 and the government has no information tying him to the substantive charges in those counts. [Doc. 846 at 11.]

In light of the government's representations in its response, the Court **DENIES AS MOOT** Wall's Motion for Bill of Particulars [Doc. 675].

### III.   MOTION TO SUPPRESS EVIDENCE [704-2]

As noted above, Wall has adopted his Motion to Suppress Evidence [Doc. 704-2], which he filed in *Wall I*. An evidentiary hearing on that motion was held before me on March 14, 2016. All transcript references are to the transcript of that hearing, which is docketed as Doc. 30 in *Wall I*. References to particular pages are noted as "Hr'g Tr. at __." On April 29, 2016, Wall filed a post-hearing brief [*Wall I* Doc. 35], and the government has filed a response in this case [Doc. 1022].

#### A.   Background

On December 17, 2014, Investigator Enrique D. Hogan of the Bibb County, Georgia, Sheriff's Office arrested Wall at an apartment in Cobb County, Georgia, on arrest warrants issued out of Bibb County, Georgia. (Hr'g Tr. at 4, 7-9.) Wall was arrested without incident. (*Id.* at 10, 23.) Investigator Hogan told Wall that he would be taken back to a police station in Bibb County and asked him if he had any property that he would like to take with him. (*Id.* at 10-11.)

Wall responded that he wanted to take his "stuff" with him, which included some plastic containers, a suitcase, and some shoe boxes. (*Id.* at 11.) Investigator Hogan agreed to transport the items to Macon. (*Id.* at 13.)

Before the items were loaded into Investigator Hogan's vehicle for transport, Investigator Hogan checked them to ensure they did not contain any weapons. (Hr'g Tr. at 13.) He first checked the suitcase, in which he discovered money bound in a "money wrapper." (*Id.* at 14, 27-28.) Investigator Hogan asked Wall about the money, and Wall responded that "he was going to [the] club that night to make it rain." (*Id.* at 28.)

The record is in conflict about what happened next. At the evidentiary hearing in this case, Investigator Hogan testified that after searching the suitcase, he reached into one of the plastic contains and felt some ammunition. (Hr'g Tr. at 14-17.) He testified that he then called the prosecutor in Bibb County handling the case and informed her that he had discovered money and ammunition. (*Id.* at 15.) The prosecutor then advised him that he needed to obtain a warrant to search the plastic container from a Cobb County magistrate. (*Id.* at 34.)

However, at a motion hearing in 2015 before the Superior Court of Bibb County, Investigator Hogan testified that after he discovered the money in the suitcase, but before he discovered the ammunition, he contacted the prosecutor to

obtain a warrant to search the plastic box. (Hr'g Tr. at 29.) Investigator Hogan explained that this inconsistency was due to the fact that, at the 2015 hearing, he was testifying based on his best memory at the time. (*Id.* at 30, 32.)

Regardless, there is no dispute that when Investigator Hogan searched the suitcase (and possibly the plastic container) within the apartment, Wall was handcuffed and seated outside the door to the apartment on a stoop. (*Id.* at 18, 23-24.) There is also no dispute that after speaking with the prosecutor, Investigator Hogan, two deputies, and Wall then drove together in a single vehicle to the courthouse in Marietta to obtain the warrant. (Hr'g Tr. at 34-35.) Investigator Hogan left the deputies and Wall in the vehicle while he went inside and obtained the search warrant. (*Id.* at 35, 37.)

The warrant that Investigator Hogan obtained authorized the search of "plastic containers which may have evidence of the crime of murder, these items include the following: semi-automatic fire arms, ammunition, clothing, shoes, cell phones, [and] street gang related items." (Gov't Ex. 1B.) After obtaining the warrant, Investigator Hogan, the deputies, and Wall returned to the apartment. (Hr'g Tr. at 42.) While Wall remained in the vehicle, Investigator Hogan searched the plastic containers. (*Id.* at 43, 51.) He may have also searched the black suitcase and the shoeboxes at that time as well. (*Id.* at 43) The suitcase,

7

plastic containers, and the shoe boxes were then placed in the back of Officer Hogan's vehicle, transported to Bibb County, and turned over to law enforcement. (*Id.*)

Investigator George Witherspoon with the Bibb County Sheriff's Office processed the items, which included going through the property and inventorying it on a property receipt. (Hr'g Tr. at 68-70.) According to the property receipt that Investigator Witherspoon prepared, the ammunition was located in the suitcase, rather than in the plastic bin. (*Id.* at 71; Gov't Ex. 3.)

### B. Discussion

#### 1. The Parties' Arguments

Wall does not dispute that evidence found in the plastic containers pursuant to the search warrant may be introduced at trial. [*Wall I* Doc. 35 at 6.] Rather, Wall contends that any evidence contained in the suitcase—including, he contends, the ammunition—should be suppressed because the warrant did not authorize law enforcement to search the suitcase. [*Id.* at 6-7.]

The government responds that assuming that the ammunition was discovered in the suitcase, the search was lawful under any of three theories. [Doc. 1022 at 5.] First, the government argues that the search of the suitcase was within the scope of the warrant because the term "plastic container" is broad

enough to include the suitcase. [*Id.*] The government points out that the black suitcase was "made of some sort of machine-made material"; thus, it was not unreasonable for officers to believe that the warrant authorized the search of the black suitcase. [*Id.* at 6.] The government further argues that on its face, the warrant "arguably" authorized the search of the entire apartment, and the inclusion of plastic containers did not limit the scope of the search. [*Id.*]

Second, the government argues that the search was incident to arrest. [Doc. 1022 at 7.] The government points out that Wall asked officers to take his property with them to Bibb County where he would be booked, and that officers had the right to search the containers before loading them into their vehicles to ensure that they did not contain items that might pose a danger. [*Id.* at 7.]

Third, the government contends that the contents of the suitcase (including the ammunition) would have been discovered by lawful means, and, therefore, the evidence falls within the inevitable discovery doctrine. [Doc. 1022 at 7.] The government acknowledges that the record is silent as to the Bibb County jail inventory policy, but nonetheless maintains that there is "ample testimony from which one could reasonably infer such a policy existed," including Investigator Hogan's testimony that the department prohibited from putting any personal effects of an arrestee into his police vehicle without first searching them for

weapons. [*Id.* at 8.] Similarly, the government contends that the ammunition would have been discovered when Wall was processed into jail because a "strong[] rationale exists for checking property kept in the jailer's custody while an arrestee is incarcerated." [*Id.*]

### 2. Analysis

#### a. The Scope of the Warrant Does Not Include the Suitcase.

The government's argument that because the black suitcase is made of synthetic material it is a "plastic container" is unpersuasive. Simply put, it is not reasonable for a law enforcement officer to believe that the term "plastic container" includes a suitcase like Wall's.

In addition, the government's argument that the warrant authorized the search of the entire apartment is misplaced. The warrant plainly states that the "property, items, articles, instruments to be searched for and seized are . . . specifically described as follows: plastic containers which may have evidence of the crime of murder, these items include the following: semi-automatic fire arms, ammunition, clothing, shoes, cell phones, [and] street gang related items." (Gov't Ex. 1B.) The warrant does state that the foregoing property was located at an

apartment located at 750 Franklin Road in Marietta, but nothing in the language of the warrant authorizes the search of the apartment itself.

Accordingly, the Court rejects the government's argument that the search of the suitcase fell within the scope of the warrant.

### b. The Government Has Not Met Its Burden to Demonstrate that the Search of the Suitcase was a Valid Search Incident to Arrest.

The government bears the burden of establishing that a warrantless search and seizure were reasonable based upon a recognized exception to the warrant requirement. *See United States v. Bachner*, 706 F.2d 1121, 1125-26 (11th Cir. 1983). With respect to the government's theory that the search of the suitcase could have been valid as a search incident to arrest, the Court is constrained to conclude that the government has not met its burden.

The crux of the government's argument is that law enforcement officers have a "legal right" to search containers before loading them into their vehicles to ensure that the containers do not contain items that could pose a danger to them. [Doc. 1022 at 7.] The government then cites *Arizona v. Gant*, 556 U.S. 332 (2009), for the proposition that the search incident to arrest exception exists for the protection of officers, especially in arrest situations, and an unpublished Eleventh Circuit case, *United States v. Smith*, 481 F. App'x 540 (11th Cir. 2012),

for the proposition that a search incident to a lawful arrest is a traditional exception to the warrant requirement. [*Id.*] The government does not, however, make any effort to apply the facts of this case to the law.

The government's failure to tie the law to the facts of this case is problematic because the determination of whether a search was incident to arrest depends on the particular facts of a case. "A search incident to arrest is always allowed of the suspect's person and the immediate area from which the suspect can grab a weapon or destroy evidence." *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir.1987) (citing *Chimel v. California,* 395 U.S. 752 (1969)). The proper inquiry is whether the area searched was within the defendant's immediate control at the time of his arrest. *See, e.g.*, *United States v. Abdul-Saboor*, 85 F.3d 664, 667 (D.C. Cir. 1996). As the Eleventh Circuit has explained: "Law enforcement agents are also permitted to search for weapons or evidence incident to a suspect's lawful arrest, though the scope of that search is limited to the grab area within the suspect's immediate reach. *United States v. Bennett*, 555 F.3d 962, 966 (11th Cir. 2009) (*per curiam*).

Here, the government makes no mention of where the suitcase was in relation to Wall at the time it was searched. It may be significant that Wall had already been placed in handcuffs and was outside the front door to the apartment,

and was in the presence of several law enforcement officers when the first search occurred. *See Gant*, 556 U.S. at 1719 (holding, in the vehicle search context, that a warrantless search was unreasonable where "police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense [of arrest] might have been found therein"). It may also be significant that Wall was in custody in Investigator Hogan's police vehicle with two other deputies at the time of the second search, and that after the search, the suitcase was placed in the bed of the truck. Under these facts it is not unreasonable to conclude that was all but impossible for Wall to have gained access to a weapon inside the suitcase, and it is certainly not a foregone conclusion that the search was incident to arrest. *See United States v. Lyons*, 706 F.2d 321, 330 (D.C. Cir. 1983) ("To determine whether a warrantless search incident to an arrest exceeded constitutional bounds, a court must ask: was the area in question, at the time it was searched, conceivably accessible to the arrestee—assuming that he was neither an acrobat [nor] a Houdini.").

The government's argument is, at bottom, one of assertion. Given the government's complete failure to apply the law to the facts of the case, the Court finds that the government has not carried its burden to demonstrate that the search of the suitcase was a valid search incident to arrest.

      **c.      The Government Has Not Carried Its Burden to Show that the Warrantless Search of the Suitcase Falls Within the Inevitable Discovery Exception to the Warrant Requirement.**

The government's final theory is that the warrantless search of the suitcase was valid under the inevitable discovery doctrine. [Doc. 1022 at 7-8.] The government contends that, because Wall asked that the suitcase be transported with him, it was inevitable that that law enforcement would have searched it and discovered the ammunition. The government states that law enforcement had a policy of searching any containers for potential dangerous items before transporting them, so it was inevitable that the suitcase would have been searched and the ammunition discovered as a result of that search. The government also argues that, because Wall was processed into the Bibb County Jail, it was inevitable that the suitcase would be searched at that time too. [*Id.*]

The Supreme Court has recognized at least three exceptions to the exclusionary rule involving the causal relationship between the unconstitutional act and the discovery of evidence, where the remedial objectives of the rule do not outweigh its substantial costs. *Utah v. Strieff,* 136 S. Ct. 2056, 2061 (2016). Those exceptions include: (1) the independent source doctrine, which allows trial courts to admit evidence obtained in an unlawful search if officers independently

acquired it from a separate, independent source; (2) the inevitable discovery doctrine, which allows for the admission of evidence that would have been discovered even without the unconstitutional source; and (3) the attenuation exception, which permits the admission of evidence where the connection between unconstitutional conduct and the evidence is remote or has been interrupted by some intervening circumstance.  *Id.* (citing *Murray v. United States*, 487 U.S. 533, 537 (1988) (independent source doctrine); *Nix v. Williams*, 467 U.S. 431, 443-444 (1984) (inevitable discovery doctrine); and *Hudson v. Michigan*, 547 U.S. 586, 593 (2006) (attenuation doctrine)).

The inevitable discovery doctrine applies if the prosecution can establish that the challenged evidence "ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444.  The Eleventh Circuit applies a two-part standard to determine whether a showing of inevitable discovery has been made.  In order for the unlawfully obtained evidence to be admissible, there must be (1) a reasonable probability that the evidence would have been discovered by lawful means, and (2) the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct. *United States v. Satterfield*, 743 F.2d 827, 846 (1984) (citing *United States v. Brookins*,

614 F.2d 1037 (5th Cir. 1980)), *superseded by statute as to an unrelated issue as recognized in United States v. Edwards*, 728 F.3d 1286, 1292 (11th Cir. 2013).

"When police take custody of a bag, suitcase, box, or any similar container, they may open it in order to itemize its contents pursuant to standard inventory procedures." *United States v. Farley*, 607 F.3d 1294, 1333 (11th Cir. 2010). "Judicial tolerance of such searches derives from the need to protect the owner's property, to protect the police from disputes over lost property and to protect the police from potential danger." *United States v. Laing*, 708 F.2d 1568, 1570 (11th Cir. 1983). A jailhouse search of a container belonging to an arrestee is not *per se* reasonable as an inventory search, however. The government bears the burden of demonstrating standardized criteria or an established routine that governs the inventory search and that the officers conducting the search complied with departmental policy. *See Florida v. Wells*, 495 U.S. 1, 4 (1990); *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992).

After careful review of the hearing testimony, the record evidence, and the arguments of the parties, the Court is constrained to find that the government has not met its burden in this case. At the evidentiary hearing, the government did not present any evidence concerning "standardized criteria" or an "established routine" governing inventory searches at the Bibb County jail. Indeed, the

16

government concedes that the record is silent as to the requirements of an inventory search. [Doc. 1022 at 8.]

The government nonetheless argues that the Court could infer that a standardized inventory policy exists because Investigator Hogan "testified that the department prohibited him from putting personal effects of an arrestee into his police truck without first searching the items." [Doc. 1022 at 8.] The government overstates Investigator Hogan's testimony. Investigator Hogan did not testify concerning standardized department procedures, much less policies at the jail where the inventory search was conducted. Rather, he simply testified that he intended to search the containers to clear them for weapons before transport. (Hr'g Tr. at 13.)

The government also fails to point to any evidence that the containers were searched at the Bibb County Jail in furtherance of a legitimate reason for conducting an inventory search, such as safeguarding Wall's property while in police custody, protecting the police from claims of lost or stolen property, or protecting the police from potential danger. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987). The record indicates that officers performed the search to locate and preserve evidence. Investigator Witherspoon, the officer who conducted the search, testified that he would conduct a search of "anything that possesses any

17

type of evidentiary value," and at no time gave any other reason for the search. (Hr'g Tr. at 69.) Similarly, the property receipt form indicates that the purpose for which the property was obtained was "Evidence." (Gov't Ex. 3.) The bottom line is that the government has not carried its burden to show that the search of the suitcase was routine, and to the contrary, it appears that it was motivated entirely by a desire to obtain evidence of criminal wrongdoing.

Accordingly, presuming, as the parties do, that the ammunition was located in, and recovered from, the suitcase, the Court concludes that the government has not established that the search of the suitcase was lawful under the inventory search exception to the warrant requirement. As a result, the Court cannot say that there was a reasonable probability that the evidence would have been lawfully discovered pursuant to an inventory search.

### C.   Summary

For the reasons that follow, the Court finds that the search of the suitcase was a warrantless search. As a result, the government bears the burden to show that the warrantless search falls within an exception to the warrant requirement. Neither theory that the government advances is persuasive, however. Accordingly, it is **RECOMMENDED** that Wall's motion to suppress be

**GRANTED** and that that evidence obtained as a result of the search of the suitcase—including the ammunition—be suppressed.

## IV.   CONCLUSION

For the following reasons it is **ORDERED** that Motion for Bill of Particulars [Doc. 675] be **DENIED AS MOOT**.  It is **RECOMMENDED** that the Amended Motion to Suppress Evidence [Doc. 704-2] be **GRANTED**.

There are no matters pending before me for Defendant Wall (7), and I have not been advised of any impediments to the scheduling of a trial as to this defendant.  Accordingly, this matter as to this defendant is **CERTIFIED READY FOR TRIAL.**[2]

IT IS SO ORDERED, RECOMMENDED, and CERTIFIED this 11th day of October, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[2] Since matters pertaining to Wall's codefendants still are pending, the District Court is not required to place Wall's case on the trial calendar at this time. 18 U.S.C. § 3161(h)(6).